IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TIMOTHY LEE BURCHETT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:15cv0411 (JFA) |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner, | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment.  Plaintiff seeks

judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of the Social

Security Administration ("Commissioner"), denying plaintiff's claim for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the

Social Security Act.  *See* 42 U.S.C. §§ 423, 1382.  The Commissioner's final decision is based

on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of

Disability Adjudication and Review ("Appeals Council") that claimant was not disabled as

defined by the Social Security Act and applicable regulations.[1]

On July 13, 2015, plaintiff filed a motion for summary judgment (Docket no. 12) and

memorandum in support (Docket no. 13).  Thereafter, defendant submitted a cross-motion for

summary judgment (Docket no. 14), memorandum in support (Docket no. 15), and memorandum

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 8).  In accordance with those rules, this opinion excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

in opposition (Docket no. 16). The two briefs submitted on behalf of the Commissioner are identical. (Docket nos. 15, 16). It appearing that plaintiff has chosen to forego submitting a reply brief, the court finds this matter ripe for disposition. For the reasons set forth below, plaintiff's motion for summary judgment (Docket no. 12) will be denied; the Commissioner's cross-motion for summary judgment (Docket no. 14) will be granted; and the Commissioner's final decision will be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff applied for SSI and DIB on November 7, 2008 with an alleged onset date of August 31, 2008. (AR 316–25). The Social Security Administration denied plaintiff's claims initially (AR 180–89) and on reconsideration (AR 194–99). After receiving the notice of denial, plaintiff's counsel requested a hearing before an ALJ.[2] The Office of Disability Adjudication and Review acknowledged receipt of plaintiff's request (AR 202–03) and scheduled the matter for a hearing on January 28, 2011 (AR 209–14).

On March 31, 2010, plaintiff pleaded guilty to a drug distribution charge in federal court and served fifteen months prior to supervised release. (AR 98, 123). As a result, plaintiff was unable to physically attend the hearing on January 28, 2011 and he appeared by phone. (AR 115–16). ALJ Susan Maley presided over the telephonic hearing from the Baltimore hearing office. (AR 115). Before proceeding with testimony, the ALJ acknowledged plaintiff's designation of Thomas S. Hood as his newly appointed representative. (AR 115). On April 29, 2011, Judge Maley issued a decision denying plaintiff's claims for disability under the Social Security Act. (AR 157–68). In reaching this decision, Judge Maley concluded that plaintiff was

---

[2] On February 10, 2009, plaintiff signed a form entitled "Appointment of Representative," authorizing William C. Power to act on plaintiff's behalf with respect to his asserted claims. (AR 190). Thereafter, plaintiff filed a "Request for Hearing by Administrative Law Judge" on April 29, 2009. (AR 200–01).

not disabled under either Title II (sections 216(i) and 223(d)) or Title XVI (section

1614(a)(3)(A)) of the Social Security Act.

On May 25, 2011, plaintiff filed a request for review with the Appeals Council. (AR

251–53). Subsequent correspondence indicates that requests to supplement the record were

received and approved by the Appeals Council. (AR 257–59). On February 8, 2012, the

Appeals Council remanded plaintiff's case to resolve three issues. (AR 176–78). The Appeals

Council also directed the ALJ to consider the testimony of a vocational expert. (AR 176–78).

> The Administrative Law Judge will obtain evidence from a vocational expert to
> clarify the effect of the assessed limitations on the claimant's occupational base
> (Social Security Rulings 83-12, 83-14, and 85-15). The hypothetical questions
> should reflect the specific capacity/limitations established by the record as a
> whole. The Administrative Law Judge will ask the vocational expert to identify
> examples of appropriate jobs and to state the incidence of such jobs in the national
> economy (20 CFR 404.1566 and 416.966). Further, before relying on the
> vocational expert evidence the Administrative Law Judge will identify and
> resolve any conflicts between the occupational evidence provided by the
> vocational expert and the information in the Dictionary of Occupational Titles
> (DOT) and its companion publication, the Selected Characteristics of Occupations
> (Social Security Ruling 00-4p).

(AR 177–78). Thereafter, the Office of Disability Adjudication and Review issued a notice

indicating the hearing following remand would be held on April 23, 2013. (AR 295). Plaintiff

acknowledged receipt of the notice on February 19, 2013. (AR 308).

On April 23, 2013, a hearing was held before ALJ R. Neely Owen in Charlottesville,

Virginia. (AR 76). Plaintiff appeared with counsel and presented testimony that addressed the

issues identified by the Appeals Council on remand. As explained during the hearing, Judge

Owen conducted a *de novo* review of all available evidence. (AR 78–80). Judge Owen also

relied upon the testimony of a vocational expert. (AR 100–07). On July 15, 2013, Judge Owen

issued a decision denying plaintiff's claims. (AR 45–66). In reaching that decision, Judge Owen

concluded that plaintiff was not disabled under either Title II (sections 216(i) and 223(d)) or

Title XVI (section 1614(a)(3)(A)) of the Social Security Act.

Plaintiff filed a request for review with the Appeals Council on July 22, 2013. (AR 41).

Plaintiff's counsel also submitted a letter to the Appeals Council, dated September 17, 2013,

objecting to specific findings made by Judge Owen:

> The Administrative Law Judges' findings that the Claimant can perform Light
> Work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) and that there are jobs
> in the national economy that he can perform is not supported by substantial
> evidence in the record. Accordingly, it is respectfully requested that the finding
> that the Claimant is not disabled be vacated.

(AR 477–79). The Appeals Council considered this submission and other additional evidence

prior to rendering a decision. (AR 6). However, a substantial portion of this evidence referenced

treatments and/or consultations after Judge Owen's decision, which precluded the Appeals

Council from considering that evidence.[3] On January 28, 2015, the Appeals Council denied

plaintiff's request for review. (AR 1–5). As a result, the decision rendered by Judge Owen

became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

On March 25, 2015, plaintiff filed a complaint in the U.S. District Court for the Eastern

District of Virginia, seeking judicial review pursuant to 42 U.S.C. § 405(g). (Docket no. 1).

Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for

resolution. (Docket no. 19). This case is now before the court on cross-motions for summary

judgment. (Docket nos. 12, 14).

---

[3] These records include: a narrative from Douglas Sigmon, M.D., dated November 18, 2014; a narrative from
Stephen Reiter, M.D., dated November 20, 2014; records from Rappahannock-Rapidan Community Services, dated
September 12, 2013 to November 20, 2013; and records from Fauquier Hospital Emergency Department, dated
September 12, 2013. (AR 2).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

In determining whether the Commissioner's decision is supported by substantial evidence, the court must examine the record as a whole, but may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *See Perales*, 402 U.S. at 390. Moreover, the Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *See Hays*, 907 F.2d at 1456–57. Overall, if the Commissioner's resolution of conflicts in the evidence is supported by substantial evidence, the district court must affirm the decision. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

### III. FACTUAL BACKGROUND

#### A. Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1966 and was forty-seven years old at the time of the ALJ's decision

following remand. (AR 65–66, 101). Plaintiff left high school in the eleventh grade and

obtained his GED in 1984. (AR 101, 837). Thereafter, plaintiff began working in construction.

(AR 364). Plaintiff also completed training in computer programming in the mid-1990s. (AR

776). During periods of unemployment, plaintiff received financial support from his family and

public assistance. (AR 88, 775–76). Plaintiff's most recent job involved supervising employees

in the production and distribution of asphalt. (AR 367). Plaintiff's last day of employment was

on August 31, 2008. (AR 90).

Treatment records indicate that plaintiff moved to Martinsburg, West Virginia in 2003

while continuing to report to healthcare providers in Virginia. (AR 775). On February 1, 2008,

plaintiff relocated to Ranson, West Virginia and continued to reside at that location until his

arrest and subsequent incarceration.[4] (AR 317). Once eligible for supervised release, plaintiff

reported to a halfway house until December 2011. (AR 98). Thereafter, plaintiff returned to

Virginia, where he currently resides with his sister. (AR 82).

#### B. Summary of Plaintiff's Medical History

Plaintiff's medical history is complex and expansive. The complexity is partly a function

of inaccurate self-reporting and disjointed follow-up consultations. The Administrative Record

also contains over one thousand pages of medical records that cover approximately fourteen

---

[4] Plaintiff was arrested in September 2009 on charges of drug distribution. (AR 122–23). After six days, plaintiff was able to post bail. (AR 777). Plaintiff continued to seek treatment from various providers until his sentencing hearing in March 2010. Thereafter, plaintiff served fifteen months in federal prison before being released to a halfway house on June 7, 2011. (AR 98).

years. This summary provides a basic overview of plaintiff's medical history and is not intended to be an exhaustive list of each and every medical treatment.

    1. *Medical History: May 29, 2001 to August 31, 2008*

    Plaintiff first presented to his primary care physician Dr. Douglas Sigmon on May 29, 2001. (AR 786). Plaintiff initially sought a follow-up consultation with Dr. Sigmon after being admitted to the emergency room with complaints of abdominal pain and hematuria. Dr. Sigmon arranged for an intravenous pyelogram, which identified a kidney stone. (AR 790). Plaintiff's earlier medical records are otherwise unremarkable and include occasional treatment for hypertension, generalized anxiety, abdominal pain, obstructive sleep apnea, acid reflux disease, and edema. Several treatment records also recommend smoking cessation, which plaintiff inconsistently and unsuccessfully attempted over the course of several years.

    On February 6, 2003, Dr. Sigmon referred plaintiff to the radiology department at Prince William Hospital in response to complaints of left arm paresthesia. (AR 789). Imaging of plaintiff's cervical spine revealed "some low-grade mid cervical degenerative changes" but was otherwise unremarkable. (AR 789). The follow-up MRI on February 20, 2003 revealed degenerative disc disease, moderate spinal stenosis from the C3-4 through C6-7 levels, areas of disc protrusions, and degenerative end plate change. (AR 787–88).

    On March 31, 2003 and approximately five years prior to the alleged onset date, plaintiff underwent a multi-level hemilaminectomy, partial facetectomy, and foraminotomy at C4 through C7 with segmental fixation. (AR 807–09). The attending physicians, Dr. Thomas Schuler and Dr. Brian Subach, noted a history of progressive cervical spine stenosis and radicular pain that limited plaintiff's mobility and motor control. (AR 808). The procedure was performed without complication and a post-operative consultation on May 15, 2003 reported increased strength in

plaintiff's upper extremities and diminished pain in the left arm. (AR 797–98). Dr. Subach also recommended limiting work to "light duty status" for three months along with physical therapy to strengthen plaintiff's upper extremities. (AR 798).

Treatment notes obtained from Loudoun Hospital Center indicate that plaintiff presented with complaints of pelvic discomfort on October 3, 2004. (AR 1321). An initial CT scan identified a kidney stone, but could not be identified on subsequent scans. (AR 1320). On October 22, 2004, plaintiff underwent a cystourethroscopy that involved the placement of a ureteral stent. (AR 1316). The procedure was performed without complication. (AR 1317).

On June 22, 2005, plaintiff underwent a neurologic consultation following a referral from Dr. Sigmon's office. (AR 799–801). During that consultation, plaintiff reported increased cervical pain that "began in the right side of his neck and then radiates up into his head." (AR 799). Based upon plaintiff's surgical history, Dr. Sarbjot Dulai recommended an MRI of the cervical spine, flexion/extension x-rays of the cervical spine, and prescribed an anti-inflammatory. (AR 801). On August 31, 2005, plaintiff underwent an MRI after experiencing neck pain and paresthesia in his left hand and right upper extremity. (AR 802). Aside from a small disc herniation at T2-3 and a slight disc bulge at C3-4, the findings were unremarkable with normal alignment and curvature. (AR 802). Medical records during this time period are otherwise limited to lab reports and bloodwork. (AR 824–32).

On April 10, 2006, plaintiff underwent a procedure that involved the removal and replacement of spinal fixations and other hardware from the March 2003 procedure. (AR 803–06). Despite limited consultation prior to surgery, the operative report references evidence of progressive facet syndrome and instability across the cervicothoracic junction. (AR 804). The report also references "evidence of neural compromise requiring revision hemilaminectomy . . .

8

[and] significant foraminal stenosis at C6-C7 and T1." (AR 804). The procedure itself is explained in greater detail throughout the Administrative Record.[5]

During an initial follow-up appointment with Dr. Subach on May 17, 2006, plaintiff complained of ongoing neck and upper back pain that began approximately three weeks after surgery. (AR 722–23). Plaintiff was advised to consult with Dr. Thomas Nguyen for pain management, return to assess his work status with a physician's assistant, and follow-up with Dr. Subach after completing x-rays. (AR 722). On August 30, 2006, plaintiff returned for a consultation with Dr. Nguyen and reported ongoing discomfort—some of which he attributed to a recent accident at work. (AR 719–20). Plaintiff also expressed concern that recurring pain could potentially result in the loss of his job. (AR 719). A physical examination revealed limited range of motion in the cervical spine, myofascial upper thoracic and cervical tenderness, but was otherwise unremarkable for signs of serious injury or distress. (AR 719).

On October 19, 2006, plaintiff returned to the Virginia Spine Institute with the previously requested x-rays of the cervicothoracic spine. (AR 716–18). Following a physical examination, Dr. Subach noted that plaintiff continued to experience significant muscular pain, but attributed the amplification of that pain to plaintiff's work. (AR 717). Treatment notes also reference issues of credibility and potential dependence and/or abuse of the prescribed pain medications. (AR 716–17). Dr. Subach executed a medical notice, limiting plaintiff to ten hours of work per day with a weight lifting restriction of ten pounds. (AR 717).

---

[5] In a letter to the Appeals Council on September 17, 2013, plaintiff's counsel describes the procedure as follows:
> The surgery included removal and re-placement of posterior segmental spinal fixation C3, C4, C5, C6, C7, T1, T2, T3, T4, revision of left and right C6, C7 hemilaminotomy and foraminotomy; posterior cervical osteotomy C7-T1, right and left T1 hemilaminotomy and foraminotomy, posterolateral arthrodesis C3-4 to T3-4, bone graft and thoracic electromyelogram for intercostal musculature.

(AR 478). A step-by-step summary of the "surgical technique" is also included in the operative report dated April 20, 2006. (AR 803–06).

On January 19, 2007 plaintiff continued to report ongoing neck pain. (AR 713–15). X-rays were also reviewed during this time, but were unable to confirm whether hardware from the prior surgery had shifted. (AR 714). Dr. Subach recommended a CT scan to determine whether plaintiff's instrumented fusion was functioning properly. (AR 714). Additionally and despite these complications, plaintiff's overall health appeared to be improving during this time. (AR 713). During a physical examination on April 12, 2007, Dr. Subach noted exquisite tenderness over T6 and T5/6 interspace, mild tenderness over the T5/6 facet joint, and general tenderness over the hardware. (AR 710). Plaintiff continued to work with Dr. Nguyen on pain management and stated the current medication regime was helpful. (AR 710).

On September 14, 2007, plaintiff presented for a follow-up appointment to address complaints of chronic neck and shoulder pain. (AR 708–09). Treatment notes also reference a prior appointment "two weeks ago at which time [plaintiff] was no longer responsive on his previous regimen of chronic opiate medications." (AR 708). In response, Dr. Nguyen amended plaintiff's drug treatment to include methadone. During this time, plaintiff's medications also included Roxicodone, Ambien, Nexium, and Benicar. (AR 708). Plaintiff also reported resuming Cymbalta for treatment of generalized anxiety disorder. Despite being satisfied with this regimen and reports of overall good pain control, plaintiff continued to experience limited range of motion of the cervical spine and mild paraspinal muscle tenderness. (AR 708). Plaintiff also reported difficulty sleeping due to muscle spasms, which Dr. Nguyen recommended addressing with Klonopin. (AR 709).

Plaintiff returned to Dr. Nguyen on November 28, 2007 after experiencing severe nausea and vomiting with his new medication. (AR 706–07). Treatment records indicate that plaintiff's methadone treatment was previously discontinued after plaintiff reported experiencing episodes

of nausea and drowsiness. (AR 706). However, upon returning to the Virginia Spine Institute, plaintiff requested a second trial of methadone, which Dr. Nguyen permitted, along with instructions to discontinue Xanax and return all remaining oxymorphone in two weeks. (AR 707). Treatment records do not indicate whether plaintiff returned the medication as directed.

On December 10, 2007 plaintiff reported improvement in pain control and nearly immediate resolution of nausea following the introduction of methadone. (AR 704–05). However, plaintiff continued to report localized pain in the posterior cervical region and shoulder blades. (AR 704). Dr. Nguyen recommended restarting Klonopin and Cymbalta for pain management. (AR 705). Plaintiff returned for a follow-up on February 5, 2008. (AR 546–58). Despite reporting neck pain and accompanying occipital headaches, Dr. Nguyen noted adequate range of motion with respect to the cervical spine. (AR 546). Plaintiff also indicated that current medications no longer provided effective pain relief; however, Dr. Nguyen declined to alter the current regime until the completion of a sleep study.[6] (AR 547).

Plaintiff sought emergency treatment at Jefferson Memorial Hospital on March 2, 2008. (AR 507–14). Following an initial assessment, plaintiff underwent a CT scan of the lumbosacral spine and thoracic spine. (AR 515–16). A subsequent review of the lumbosacral spine revealed properly aligned vertebral bodies and evidence of mild age-related degenerative joint disease. (AR 515). Similarly, images of the thoracic spine were described as "unremarkable, with vertebral bodies being of normal height and appearance" along with evidence of mild age-related degenerative joint disease. (AR 516). The following day, plaintiff presented to the INOVA Lansdowne Emergency Department. (AR 482). Treatment notes dictated by the attending physician indicate treatment for general back pain, although "[an] exam did not show any

---

[6] Plaintiff underwent a "sleep study" to confirm a suspected diagnosis of sleep apnea on April 3, 2008. (AR 640). Results indicated "successful CPAP titration for sleep apnea" with a recommend trial of CPAP therapy (a machine that supplies a constant flow of oxygen into the lungs to address problems associated with sleep apnea). (AR 641).

obvious sign of bone (spine) or nerve damage." (AR 484). The discharge report includes the

following: "[Plaintiff] was discharged on 03/04/2008. [Plaintiff] should be able to return to

Work in 2 days. [Plaintiff] needs to following limitations: None." (AR 487).

On March 4, 2008, plaintiff returned to Dr. Nguyen for an urgent office visit. (AR 554–

55). Plaintiff reported experiencing severe back pain after attempting to get into bed, which

eventually prompted him to seek emergency treatment. (AR 554). In addition to the CT scan

and physical evaluation, plaintiff also reported further evaluation for acute myocardial ischemia,

which was negative. (AR 554). Plaintiff also reported elevated blood pressure, although several

of his symptoms responded favorably to treatment with IM Phenergan, Dilaudid, and Valium.

(AR 554). Prior to evaluation, plaintiff reported "severe nonradiating pain in the lower thoracic

region in the midline . . . different than his chronic neck and shoulder pain." (AR 554).

Surprisingly, a physical examination revealed "good range of motion of the lumbar spine." (AR

554). Aside from plaintiff's hypertension, additional findings were similarly unremarkable and

categorized by Dr. Nguyen as "more consistent with an acute strain." (AR 555). Plaintiff was

instructed to follow-up with his primary care physician and return for another evaluation in four

weeks. (AR 555).

Plaintiff returned on April 3, 2008 with complaints of neck and mid-back pain. (AR

556). While a physical examination revealed adequate range of motion with respect to the

cervical spine, Dr. Nguyen noted myofascial tenderness and spasm along the cervical and

trapezius muscles. (AR 558). Treatment notes also reference a period of "temporary disability"

beginning on March 24, 2008 and allegedly endorsed by Dr. Sigmon for a period of three weeks.

(AR 531, 558). Dr. Sigmon also requested that plaintiff undergo an echocardiogram, which was

administered on May 30, 2008 and revealed normal left ventricular systolic function, wall

12

thickness, and contractility with no significant valvular abnormality. (AR 639). Plaintiff returned for a second echocardiogram on August 15, 2008 after the results and/or images from the prior study were lost. (AR 724). Results from that study were similarly unremarkable.

Medical history reports indicate that plaintiff's mid-back pain began increasing in severity prior to the alleged on-set date of August 31, 2008. (AR 560–65). However, the accompanying progress notes endorsed by Dr. Nguyen from May 1, 2008 and June 26, 2008 indicate that "with the medications, patient is able to function and work. Patient is able to do ADLs with minimal difficulty on medications. Patient denies any diversion or abuse of prescribed medications." (AR 532, 534). Plaintiff also reported improvement in daytime fatigue and drowsiness since beginning his CPAP treatment and prescription medication for his obstructive sleep apnea ("OSA"). (AR 534–35). During this time, Dr. Sigmon began referring plaintiff to several nephrologists for treatment of edema in his legs. Plaintiff underwent initial consultations with Dr. Paul Welch on July 18, 2008 (AR 645–47) and Dr. Gregory Wang on August 20, 2008 (AR 643–44). Despite ongoing treatment recommendations from both physicians, there is no evidence of further consultation.

On August 22, 2008, plaintiff returned to Dr. Nguyen with increased pain—localized in the neck and shoulders. (AR 536–37). A physical examination was unremarkable with cervical tenderness "diffusely present over the left and right paraspinal muscles." (AR 536). Dr. Nguyen recommended discontinuing methadone and substituting a fentanyl transdermal patch to address complaints of chronic neck pain. (AR 537). Plaintiff was advised to follow-up in four weeks.

2. *Medical History: August 31, 2008 to March 31, 2010*

By September 2008, plaintiff reported mid-back pain whenever standing for more than fifteen minutes or lying down for more than four hours. (AR 566). Plaintiff also experienced

13

"pain when lifting" and "burning when pulling." (AR 566). During a follow-up appointment on September 2, 2008, plaintiff expressed frustration over certain side-effects experienced with the current medication regime—which he also believes contributed to the loss of his job. (AR 568). Following a physical examination that revealed tenderness over the low thoracic screws at the T4 level, Dr. Subach recommended cervicothoracic instrumentation removal, posterolateral fusion, and exploration of fusion. (AR 569). Plaintiff expressed interest in the procedure, provided he was able to establish employment prior to surgery. (AR 569). Dr. Subach also prescribed a seven-day supply of MS Contin for pain management even though the Duragesic patch was helpful with his pain. (AR 538). Dr. Subach noted there was no pain, numbness, or weakness in plaintiff's upper extremities. (AR 538).

Plaintiff returned for a consultation with Dr. Nguyen on September 8, 2008 after reporting "persistent intractable pain in the midthoracic parascapular region between the shoulder blades." (AR 574–76). Despite observing limited range of motion in the cervical spine, Dr. Nguyen specifically stated that he did not consider plaintiff to be completely disabled at that time and recommended that plaintiff continue seeking employment while undergoing treatment. (AR 574–75). The possibility of remedial surgery was briefly discussed, although plaintiff expressed doubts about whether the removal of hardware would help alleviate his pain. (AR 574). Dr. Nguyen also considered focusing treatment on plaintiff's depression and anxiety in conjunction with pain management therapy. (AR 575). Plaintiff returned to the Virginia Spine Institute on October 7, 2008 and November 10, 2008. (AR 540–45, 577–80). Again, Dr. Nguyen noted "the patient's pain is stable and under fair control with current regimen . . . [although] patient's activity continues to be limited due to pain. Patient is able to do ADLs with

14

minimal difficulty on medications." (AR 540, 543). Plaintiff was in no acute distress sitting in a chair, he had a normal gait, and no weakness or numbness in his extremities. (AR 540).

On December 21, 2008, plaintiff sought treatment in the emergency department at Jefferson Memorial Hospital after suffering a laceration on his chest while cutting carpet. (AR 583–88). Although a radiology report identifies a "2mm metallic foreign body," other records indicate a same-day discharge and no significant abnormalities. (AR 582, 589). Less than a week later, plaintiff presented to the emergency department at the Berkeley Medical Center in Martinsburg and requested prescription drugs for pain management. (AR 592–94). According to plaintiff, the prescriptions received from his pain management specialist were recently stolen from his home. (AR 593). After stabilizing the pain with Dilaudid and Valium, Dr. Eric Glass prescribed oxycodone with directions to follow-up with a pain management specialist. (AR 593–94).

Plaintiff returned for a follow-up with Dr. Nguyen on January 5, 2009 where he reported the stolen medications and complained of financial difficulties resulting from the loss of his job. (AR 600–02). The physical examination revealed nothing significant aside from tenderness associated with palpation of the left/right paraspinal muscles and left/right trapezius. (AR 600). Dr. Nguyen recommended continuing the current medication regime with follow-up in two months. (AR 601).

On January 7, 2009, Dr. Sigmon conducted a physical evaluation and completed a form provided by the West Virginia Department of Health & Human Resources. (AR 649–54). Following a diagnosis of cervical and thoracic pain, post-laminectomy syndrome, anxiety/depression, hypertension, and obstructive sleep apnea, Dr. Sigmon concluded that these conditions resulted in significant physical limitations and precluded plaintiff from performing

15

any full-time work. (653–64). Treatment notes also include the following statement: "I would consider patient unable to work given his pain and meds." (AR 650).[7]

On January 14, 2009, Dr. Atiya Lateef completed a residual functional capacity assessment. (AR 655–62). Findings include exertional, postural, manipulative, and environmental limitations. For exertional limitations: occasionally lifting and/or carrying up to twenty pounds, frequently lifting and/or carrying up to ten pounds, standing and/or walking (with normal breaks) for about six hours during an eight-hour workday, and unlimited pushing and/or pulling incorporating prior weight limitations. (AR 656). For postural limitations: occasionally balancing, stooping, kneeling, crouching, crawling, and climbing (avoiding ladders, ropes, and scaffolds). (AR 657). For manipulative limitations: avoiding repeated overhead work. (AR 658). And for environmental limitations: avoiding concentrated exposure to extreme cold and vibration, while avoiding even moderate exposure to workplace hazards. (AR 659). Dr. Lateef also included several notes on the severity of plaintiff's symptoms as related to activities of daily living (ADLs):

> Sometimes hard to put on shirts or socks, cannot sit for longer than 10–15 mins w/o pain. Prepares meals, dusts, cleans, makes bed, picks up stick[s] in yard, able to go out alone and drive, visits friends and family, goes to dr appts, stores, soemtimes [sic] church, difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, concentration, and getting alone with others. Can only lift 20 lbs. Can walk 100 yard[s] with 10–15 minute rest. Claimant felt to be mostly credible.

(AR 660). Dr. Lateef concluded that plaintiff's residual functional capacity should be reduced to "light with postural and environmental limitations as mentioned." (AR 662). A psychiatric review conducted on January 20, 2009 revealed no medically determinable impairments. (AR 663–76). Both assessments were affirmed on review. (AR 677–81).

---

[7] In his previous visit with Dr. Sigmon on September 17, 2008 (three weeks after the alleged disability on-set date), plaintiff's chief complaint was depression after being fired from his job. (AR 607).

A medical history form completed on March 2, 2009 includes the following complaints: "pain when standing, sitting or laying too long . . . burning pain when lifting anything over 20 pounds, have to recline when sitting." (AR 730). During that visit Dr. Nguyen noted that plaintiff's pain was stable and under fair control and that plaintiff was able to do ADLs with minimal difficulty on medication. (AR 726). Dr. Nguyen continued to treat plaintiff until his suspension of care on March 30, 2009. (AR 725–28). According to plaintiff, the discharge was the result of unpaid medical expenses. (AR 120–22). However, treatment records also indicate that plaintiff was flagged for a prescription monitoring program following "an episode of lost medications." (AR 726–27).

Plaintiff returned to Dr. Sigmon on April 1, 2009 after his discharge from the Virginia Spine Institute. (AR 733–34). Treatment records indicate that Dr. Sigmon was aware of plaintiff's disability claims, which had been denied at the initial level and were awaiting reconsideration. (AR 733). After conducting a routine physical examination, Dr. Sigmon encouraged plaintiff to establish a new pain management provider. Accompanying treatment notes also state: "If needed I will [refill] meds once next month but that is all." (AR 734).

On April 2, 2009, Dr. Fulvio Franyutti completed a residual functional capacity assessment on reconsideration. (AR 682–89). Findings with respect to plaintiff's exertional and postural limitations were identical to those at the initial level. (AR 683–84). For environmental limitations, Dr. Franyutti recommended avoiding concentrated exposure to extreme cold, extreme heat, vibration, and hazards. (AR 686). Lastly, Dr. Franyutti was unable to identify any manipulative, visual, or communicative limitations. (AR 685–86). A psychiatric review performed on April 3, 2009 identified a medically determinable impairment, but concluded that

"depression w/ anxiety" did not satisfy the diagnostic criteria under Listing 12.04 ("Affective Disorders"). (AR 693, 699–700).

Following the denial of plaintiff's claims on reconsideration, Dr. Sigmon completed a "Physical Capacities Evaluation" dated April 16, 2009. (AR 735–38). The evaluation limits plaintiff to less than two hours of standing and/or walking in an eight-hour hour workday and suggests that plaintiff is incapable of sitting for more than twenty minutes without the option of reclining—Dr. Sigmon also limited plaintiff to occasionally lifting up to ten pounds. (AR 735–36). Plaintiff was otherwise incapable of repetitive pushing or pulling, bending, crawling, climbing, kneeling, or balancing. Despite these exertional, postural, and manipulative limitations, Dr. Sigmon did not recommend avoiding exposure to workplace hazards, which departs from his earlier assessment. (AR 737). Dr. Sigmon concluded that plaintiff was incapable of performing light work, while it remained "unclear" whether the aforementioned limitations would preclude the performance of sedentary work. (AR 738).

Thereafter, Dr. Sigmon referred plaintiff to another pain management specialist who conducted an initial evaluation on May 26, 2009. (AR 744–47). Following a review of plaintiff's medication regime, Dr. James Henick observed evidence of inaccurate self-reporting and prescription drug abuse. (AR 744). A Board of Pharmacy review later confirmed that Dr. Sigmon prescribed 180 tablets of methadone on April 30, 2009, which should have lasted 30 days under plaintiff's current regime. (AR 744–45). A physical examination revealed decreased range of motion in the neck, although plaintiff was able to arise from a seated position and walk without antalgic gait. (AR 746). Dr. Henick also refused to prescribe narcotics pending a urinalysis and drug screening, which plaintiff requested be withdrawn. (AR 746). A potentially related (although undated) letter signed by Dr. Sigmon also states: "I will not prescribe any

18

opiates to [plaintiff]. He needs to be under the care of a Pain Management specialist. I will continue to act as his Primary Care physician." (AR 836). A letter from "The Martinsburg Institute" indicates that plaintiff participated in a private methadone treatment program from August 17, 2009 until October 30, 2009 under the direction of Dr. Susan Voss. (AR 1037).

On November 3, 2009, plaintiff was seen by Dr. Safa Osman at Jefferson Primary Care in Ranson, West Virginia. (AR 765–67). During his first visit, plaintiff indicated that he was previously treated at a pain management facility in Martinsburg, but was unable to afford continued treatment. (AR 765). Treatment notes indicate that Dr. Osman continued to prescribe methadone for pain management with the intention of gradually tapering the dosage. (AR 766). Plaintiff returned on November 16, 2009 with complaints of dizziness that he attributed to his new blood pressure medication. (AR 763–64). Following a routine physical examination, Dr. Osman directed plaintiff to return on an "as needed" basis. (AR 763). Plaintiff returned on December 1, 2009 for a follow-up and prescription refill. (AR 761–62). During this visit, plaintiff complained of generalized anxiety and insomnia that he previously attempted to manage with antidepressants. (AR 761). Dr. Osman prescribed two alternative medications to address these conditions and directed plaintiff to return in four weeks. (AR 762). During the subsequent follow-up appointment on December 30, 2009, Dr. Osman continued to manage plaintiff's neck pain with methadone and Percocet, although plaintiff felt the latter to be ineffective. (AR 759–60).

On March 8, 2010, plaintiff reported to East Ridge Health Systems for substance abuse and mental health treatment as directed by his probation officer. (AR 775–81). During an interview, plaintiff reported being prescribed opiates for chronic pain until March 2009 when he was unable to afford the medication. (AR 776). Thereafter, plaintiff began self-medicating with

heroin and other "street" opiates.  Despite this period of illicit drug use, plaintiff represented that

he remained abstinent following his arrest in September 2009 and therefore, "d[id] not see a need

for alcohol or drug treatment."  (AR 776).  Plaintiff also underwent a psychiatric evaluation with

Dr. Jafar Almashat on March 18, 2010.  (AR 837–38).  The evaluation was significant for signs

of opioid dependence and major depressive disorder.  (AR 838).  Dr. Almashat recommended an

outpatient substance abuse treatment program with reassessment in one month.  (AR 838).  There

is no evidence of additional follow-up.

On March 24, 2010, plaintiff returned to Dr. Osman for a blood pressure follow-up and

prescription refill.  (AR 876).  A physical examination was unremarkable, revealing a blood

pressure reading of 140/95.  Plaintiff continued to rely on methadone and Percocet for pain

management, which Dr. Osman also prescribed at the previous dose/amount and instructed

plaintiff to return for follow-up in one month.  The next day, plaintiff went to the Emergency

Room at Berkeley Medical Center with complaints of low blood pressure and dizziness.  (AR

855–56).  Attending ER personnel noted loss of appetite, recent weight loss, and potentially

related complaints of low blood pressure, dizziness, and blurred vision.  (AR 855).  Plaintiff also

indicated starting an antidepressant prior to the onset of these symptoms.  (AR 855).

Plaintiff returned to Berkeley Medical Center on March 26, 2010.  (AR 839).  Again,

plaintiff relayed complaints of low blood pressure and dizziness.  (AR 841–43).  Treatment notes

indicate stabilized blood pressure with recommended renal ultrasound and follow-up nephrology

consultation.  (AR 843).  A chest x-ray revealed cardiac size within normal limits, clear lungs,

and no infiltrates, edema, or pleural effusions.  (AR 874).  Discharge instructions directed

plaintiff to discontinue use of hypertension medications until further consultation with Dr.

Osman.  (AR 866).  A stool sample also returned positive for hematochezia.  (AR 843).  Plaintiff

returned to Dr. Osman on March 29, 2010. (AR 877–78). Following a physical examination, plaintiff received a referral for an Esphagogastroduodenoscopy ("EGD") and colonoscopy to address prior findings of hematochezia. (AR 879). It is unclear whether these procedures were performed.

### 3. *Medical History: March 31, 2010 to June 7, 2011*

In March 2010, plaintiff was sentenced to fifteen months in federal prison. During that time, plaintiff continued to receive medical treatment. On May 28, 2010, plaintiff presented for an intake screening at FCI Morgantown and relayed interest in a drug treatment program after being unable to afford prescription opioids prior to his incarceration and eventually becoming "addicted to heroin as a consequence of intense back pain post two spinal surgeries." (AR 986–87). Plaintiff also expressed interest in a psychological follow-up, which occurred on June 3, 2010. (AR 987–88). The attending psychiatrist diagnosed plaintiff with "Mood Disorder due to a Mental Condition" and suggested additional follow-up with Psychology Services. (AR 988). On June 24, 2010, plaintiff completed an eligibility interview to determine whether he qualified for the Residential Drug Abuse Program ("RDAP"). After receiving approval on June 28, 2010, plaintiff attended several group counseling sessions and individual therapy sessions during his incarceration. Records from the Bureau of Prisons document this treatment and include information on periodic physical and mental health evaluations. (AR 880–1035).

### 4. *Medical History: June 7, 2011 to July 15, 2013*

Beginning in June 2011, plaintiff reported to several providers while residing in a halfway house. For approximately three months, plaintiff sought treatment at a community health center in Washington, D.C. (AR 1038–58). Treatment notes indicate that plaintiff continued to experience back/neck pain during this time, although an initial physical evaluation

21

on June 9, 2011 revealed normal musculoskeletal inspection non-tender to palpation and "no point tenderness of spine." (AR 1057). Plaintiff also continued to seek mental health treatment for anxiety and depression. (AR 1054–55). Treating physicians noted a history of opioid abuse and recommended avoiding addictive medications. (AR 1055).

On August 3, 2011, Dr. Ama Tyus referred plaintiff to the George Washington Hospital Spine and Pain Center. (AR 1081). Treatment notes indicate that Dr. May Chin performed an initial evaluation on September 21, 2011 (AR 1062–64). Dr. Chin tentatively diagnosed plaintiff with post-laminectomy syndrome and recommended a course of cervical spine-based physical therapy. (AR 1063–64). Dr. Chin also reviewed a recent x-ray of the cervical spine and requested that plaintiff return with prior CT or MRI films to allow comparison. (AR 1061, 1064). Plaintiff did not return with the requested imaging studies. (AR 1065). A status report from the outpatient rehabilitation center at George Washington University indicates that plaintiff attended four sessions of physical therapy before requesting discharge in November 2011. (AR 1067). Plaintiff served the remainder of his sentence at the halfway house until his official release on December 2, 2011. (AR 98). At some point after his release, plaintiff moved to Bealeton, Virginia. (AR 1138).

On April 12, 2012, plaintiff was seen at the Fauquier Free Clinic, where he complained of back pain from former surgeries, migraine headaches, and high blood pressure. (AR 1136). Plaintiff reported that he had been off of his blood pressure medication since December 2011. (AR 1136) A clinic doctor referred the plaintiff to the University of Virginia Spine Center ("Spine Center") and instructed he return to the clinic in three months. (AR 1136). It appears that the plaintiff never contacted the Spine Center.

Plaintiff next went to Fauquier Hospital's emergency department and complained of right flank pain on May 20, 2012. (AR 1164–68). A CT scan of the abdomen and pelvis was unremarkable with "a tiny 1mm nonobstructing stone in left kidney." (AR 1175). Treatment notes indicate that Percocet and a muscle relaxer were prescribed for plaintiff. (AR 1167).

Plaintiff again returned to Dr. Sigmon on July 2, 2012 having no evidence of intervening follow-up since April 2009. (AR 1182–83). Dr. Sigmon's treatment notes indicate that the plaintiff said he was suffering from allergies and was sneezing significantly, which had caused more severe back pain. (AR 1182). Plaintiff also indicated that he was having difficulty dealing with stress and his blood pressure was also high when he was in pain. Physical exam revealed no acute distress, normal gait, and no edema. (AR 1182). Dr. Sigmon's notes contain a recommendation for a high blood pressure medication refill and new prescriptions for allergies and anxiety. (AR 1183). Dr. Sigmon indicated that the plaintiff should follow-up as needed.

Plaintiff returned to the Fauquier Hospital ER on November 7, 2012 and complained of neck pain. (AR 1206). However, plaintiff indicated that he was no longer on any medication for pain. (AR 1206). Following treatment with Percocet, Valium, and Dilaudid, the plaintiff reported feeling much better. (AR 1207). ER physician Dr. Michael A. Jenks instructed the plaintiff to see Dr. Sigmon in the next two days to have his blood pressure checked because it was extremely high when it was measured at the hospital. (AR 1208).

Almost three months later on February 1, 2013, plaintiff again visited Dr. Sigmon and presented with hypertension; the plaintiff reported that he had not sought any pain management because of the cost. (AR 1217). Again, Dr. Sigmon prescribed anxiety and blood pressure medications, but only indicated plaintiff should follow-up with him as needed. (AR 1218).

Plaintiff returned to the Fauquier Hospital ER on March 31, 2013 and stated that he had intensifying neck pain. (AR 1228). Plaintiff reported that he only used ibuprofen to treat the pain because he could not afford other pain medications. The treating physician noted that the plaintiff's neck was "non-tender" and had "full range of motion." (AR 1230). Plaintiff was given Dilaudid and Valium and requested that he be discharged. (AR 1230).

On April 2, 2013, the plaintiff was admitted to Fauquier Hospital with complaints of a headache and chest pain. (AR 1242–99). A CT scan of the plaintiff's head indicated no acute intracranial abnormalities existed; treatment notes indicate the plaintiff likely suffered from mild ethmoid sinus disease. (AR 1268). A chest x-ray indicated mild scarring in the lung bases; however, no acute cardiopulmonary abnormalities were present. (AR 1269). Finally, an echocardiogram showed left atrial dilation; normal left ventricular chamber dimensions and systolic function; normal right ventricular chamber dimensions and wall motion; mild dilation of the aortic root; and normal valvular anatomy and function. (AR 1271). The plaintiff was discharged on April 3, 2013 and instructed to take flexeril, azithromycin, and Tylenol #3. (AR 1286).

Plaintiff followed up with Dr. Sigmon on April 5, 2013. Dr. Sigmon's treatment notes indicate that plaintiff's headache had been resolved, although he continued to complain of neck pain. (AR 1308). Plaintiff's range of motion in his neck was limited by pain. In addition to his regular prescriptions of mirtazapine for anxiety and Lisinopril for high blood pressure, plaintiff was prescribed Valium for anxiety, Dilaudid for pain, and hydralazine for high blood pressure. (AR 1303). Dr. Sigmon indicated that plaintiff should follow-up in four weeks. (AR 1309).

## C. The ALJ's Decision on July 15, 2013

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), the individual claiming entitlement to disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). The Social Security Regulations set forth a five-step sequential evaluation for the adjudication of disability claims. It is this process the court examines on appeal whether the correct legal standards were applied and whether the final decision is supported by substantial evidence. Specifically, the Commissioner must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are considered *per se* disabling; (4) has the ability to perform their past relevant work; and (5) if unable to return to past relevant work, whether claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 (DIB); 416.920 (SSI). The regulations promulgated by the Social Security Administration also provide that all material facts will be considered in determining whether a claimant has a disability. *See* 20 C.F.R. § 1520(a)(3). Lastly, when considering a claim for DIB, the Commissioner must determine whether the insured status requirements of section 216(i) and 223 of the Social Security Act are met. *See* 42 U.S.C. §§ 416(i) and 423.

Here, the ALJ made the following findings of fact: (1) plaintiff meets the insured status requirements of the Social Security Act through December 31, 2013; (2) the record does not establish that plaintiff engaged in substantial gainful activity since August 31, 2008, the alleged onset date; (3) plaintiff has the following medically determinable impairments: lumbar back pain syndrome, a history of multi-level cervical thoracic fusion in 2006, and history of substance abuse; (4) plaintiff does not have an impairment or combination of impairments that meets or

medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P,

Appendix 1; (5) plaintiff has the residual functional capacity to perform light work as defined in

20 C.F.R. §§ 404.1567(b) and 416.967(b) assuming certain postural, manipulative, and

environmental limitations[8]; (6) plaintiff is unable to perform any past relevant work; (7) plaintiff

was forty-two (42) years old on the alleged disability onset date, which is defined as a younger

individual under 20 C.F.R. §§ 404.1563 and 416.963; (8) plaintiff has at least a high school

education and is able to communicate in English; (9) transferability of job skills is not material to

the determination of disability because using the Medical-Vocational Rules as a framework

supports a finding that plaintiff is "not disabled," regardless of whether plaintiff has transferable

job skills; (10) considering plaintiff's age, education, work experience, and residual functional

capacity, there are jobs that exist in significant numbers in the national economy that plaintiff

can perform; and (11) plaintiff has not been under a disability, as defined in the Social Security

Act, from August 31, 2008 through the date of the ALJ's decision. (AR 45–66).

## IV. ANALYSIS

### A. Overview

On March 25, 2015, plaintiff filed a complaint in the U.S. District Court for the Eastern

District of Virginia seeking review pursuant to 42 U.S.C. § 405(g). (Docket no. 1). Plaintiff

seeks reversal of the ALJ's decision on July 15, 2013, which subsequently became the final

decision of the Commissioner after the Appeals Council affirmed Judge Owen's ruling on

January 28, 2015. (AR 1–5). As previously stated, judicial review under these circumstances is

limited to considering whether the ALJ's findings are supported by substantial evidence and

---

[8] Those limitations include: "claimant cannot climb ladders/ropes/scaffolds and can only occasionally climb stairs, balance, stoop, kneel, crouch, or crawl . . . should avoid concentrated exposure to temperature extremes, vibration and hazards such as unprotected heights and moving machinery parts." (AR 61).

whether the applicable regulations were correctly applied in reaching a decision. *See Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).

### B. The ALJ's Decision Is Supported by Substantial Evidence

Plaintiff's motion for summary judgment argues that two errors were committed by the ALJ. (Docket no. 13). The first relates to the ALJ's residual functional capacity assessment prior to step four of the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e). Plaintiff argues the ALJ erred in determining that plaintiff was capable of performing light work by declining to attribute significant weight to opinions rendered by his primary care physician, Dr. Sigmon. (Docket no. 13 at 7–10). Specifically, plaintiff claims the ALJ's decision to attribute "no significant weight" to the opinions rendered by Dr. Sigmon was contrary to the "Attending Physicians Rule," which in turn, caused the ALJ to erroneously conclude that plaintiff was capable of performing light work. The plaintiff argues:

> It is submitted that Dr. Sigmon's opinions with regard to [plaintiff's] limitations and his inability to work are well supported by the medical evidence in this file. Accordingly, pursuant to the Code of Federal Regulations . . . those opinions should be given controlling weight. Judge Owen erred in failing to give the opinions such weight. Accordingly, it is submitted that the Administrative Law Judge committed error in finding that there was substantial evidence in the record to support a conclusion that the Plaintiff has residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b).

(Docket no. 13 at 10). Plaintiff claims that his testimony before ALJ Owen at the hearing on April 23, 2013 (AR 76–100) and the medical evidence including Dr. Sigmon's January 7, 2009 report (AR 652–54) and a "Physical Capacities Evaluation" completed by Dr. Sigmon on April 16, 2009 (AR 735–38) support a finding of disablity.

The second claimed error relates to the ALJ's determination at the final step of the sequential evaluation process—finding that plaintiff is capable of performing "other work" that exists in the national economy. (AR 65). Prior to making this determination, the ALJ

27

considered plaintiff's residual functional capacity and the vocational factors of age, education, and work experience as required by 20 C.F.R. §§ 404.1560(c). The ALJ also considered the testimony of a vocational expert who determined that plaintiff would be able to perform several unskilled light occupations, including: packer, cleaner, and inspector/grader. (AR 65–66). Again, plaintiff disputes the ALJ's findings with respect to his residual functional capacity: "If Dr. Sigmon's opinions are given the appropriate weight, as argued above, then the Plaintiff would have limitations which would preclude him from doing the work as a packer, cleaner, and inspector, grader testified to by the vocational expert." (Docket no. 13 at 10). However, even assuming plaintiff is capable of performing other work, plaintiff argues the available medical evidence and testimony establishes limitations that render plaintiff incapable of performing basic tasks associated with those jobs.

Based on the foregoing, plaintiff argues the decision rendered by ALJ Owen—and subsequently adopted as the final decision of the Commissioner—is not supported by substantial evidence. The Commissioner rebuts this assertion, claiming the ALJ's decision to afford less than controlling weight to Dr. Sigmon's medical assessment was proper under the applicable regulations. *See* 20 C.F.R. § 404.1527(c). The Commissioner also maintains that Judge Owen made a reasonable determination with respect to plaintiff's residual functional capacity and properly relied on testimony provided by the vocational expert in determining that plaintiff was capable of adjusting to other work in the national economy. Plaintiff requests that the final decision be reversed, or alternatively, that the matter be remanded for another administrative hearing. The Commissioner requests that the final decision be affirmed. The court will address plaintiff's two arguments in the order presented.

### C. The ALJ Properly Declined to Afford Controlling Weight to the Assessments of Dr. Sigmon and Determined Plaintiff's Residual Functional Capacity in Accordance with Applicable Law

As a general rule, greater weight is afforded to the opinion of a treating physician as opposed to a non-treating physician, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c)(2). The regulations also provide that a treating source's opinion is entitled to "controlling weight" when consistent with other substantial evidence in the record and supported by medically acceptable clinical and laboratory diagnostic techniques—commonly referred to as the "treating physician's rule." *See, e.g., Campbell v. Brown*, 800 F.2d 1247, 1249 (4th Cir. 1986) (referencing the treating physician rule as articulated in *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971) and *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983)).

Plaintiff's argument challenging his residual functional capacity is premised on the ALJ's application of the treating physician rule. The argument is that because the ALJ failed to attribute controlling weight to opinions rendered by a treating physician, the ALJ's assessment of plaintiff's residual functional capacity is also flawed. Plaintiff supports this argument by referencing reports prepared by his primary care physician, Dr. Sigmon. The first report, dated January 7, 2009, references the following conditions: chronic pain syndrome, cervical post-laminectomy syndrome, cervicalgia, hypertension, thoracic pain, thoracic post laminectomy syndrome, anxiety, depression, and obstructive sleep apnea. (AR 652–54). A summary of Dr. Sigmon's findings then concludes that plaintiff is unable to work because of severe pain. (AR 654). The second report, entitled "Physical Capacities Evaluation" appears to be a generic disability evaluation form completed by Dr. Sigmon on April 16, 2009. (AR 731–38). Findings

29

in that report include the ability to stand and/or walk for less than two hours in an eight-hour workday, sitting for no more than twenty minutes unless given the option to recline, complete restriction with regard to repetitive pushing and pulling, and the ability to occasionally lift up to ten pounds. (AR 735–38). Plaintiff also references a letter from Dr. Sigmon dated November 18, 2014 (sixteen months after the ALJ's decision) that describes an intermittent treatment relationship and "a long history of severe neck and back pain . . . [that] has prevented him from working." (AR 9).

As recognized in plaintiff's own briefing, the treating physician rule is far from absolute. (Docket no. 13 at 8). Rather, its application is triggered when the opinion of a treating source is consistent with other substantial evidence in the record and remains supported by medically acceptable diagnostic techniques. *See, e.g., Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Alternatively, the ALJ may choose "to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The Fourth Circuit has also "contemplate[d] the possibility that such opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986).

In declining to afford Dr. Sigmon's opinion controlling weight, the ALJ properly considered and weighed the conflicting evidence. As noted by the ALJ, Dr. Sigmon did not treat the plaintiff for extended periods of time (AR 56, 64) and his opinions are inconsistent with his own treatment notes, the opinions of other treating physicians, and the medical evidence as a whole. Pursuant to 20 C.F.R. § 404.1527(c), the ALJ appropriately considered and assigned weight to all available medical opinions in the claimant's record. When unable to resolve

30

conflicting assessments, the ALJ made appropriate credibility determinations based on a holistic

review of objective and subjective medical findings:

> Despite alleging disabling functional limitations, including limited abilities to lift, stand, and walk, other than his prior cervical/thoracic fusion and some age related degenerative changes of the spine, there are minimal objective findings of significant physical abnormality of the spine or any extremity. Further, repeated physical examinations during the period at issue have been relatively benign without reported findings of significantly decreased strength, sensation, or range of motion of any extremity, as would be expected with the degree of limitation alleged.

(AR 63). The ALJ also viewed plaintiff's non-compliance with alternative treatment options,

such as physical therapy, as evidence of exaggerated limitations and symptoms. (AR 62–63).

Several physical examinations conducted during the relevant time period revealed only mild

limitations that failed to substantiate plaintiff's complaints of debilitating pain. Lastly, the ALJ

considered the opinions of non-examining medical consultants and afforded some of those

opinions considerable weight as "consistent with and supported by the other evidence." (AR 64).

Based on the foregoing, the ALJ properly declined to attribute controlling weight to the

opinions and/or assessments rendered by Dr. Sigmon based on the inconsistencies with other

medical evidence throughout the record. For example, Dr. Nguyen (at the time the physician

treating the plaintiff for the complaints of pain in his back) noted on September 8, 2008 (two

weeks after the alleged disability onset date) that the plaintiff was not completely disabled and he

should continue to seek employment and continue working. (AR 575). Dr. Nguyen continued to

treat plaintiff until March 2009 and consistently noted that plaintiff was able to perform ADLs

with minimal difficulty while on medications. (AR 540, 543, 600, 726). Dr. Sigmon's report

from an examination on September 17, 2008 (three weeks after the alleged disability onset date)

refers to depression and makes no findings related to his alleged disability based on pain. (AR

607–08). And while Dr. Sigmon completed a Physical Capacities Evaluation form for the

plaintiff on April 16, 2009 (AR 731-38), he did not treat the plaintiff again until July 2012 and during that examination he noted that plaintiff had moved to West Virginia and stopped taking pain medication in 2010 (AR 1182). At that time plaintiff was in no acute distress, his gait was normal, and he denied any tingling or numbness. (AR 1182). Dr. Sigmon's treatment during that visit was limited to hypertension, rhinitis, and anxiety. (AR 1182–83). The examination and treatment of the plaintiff by Dr. Sigmon on February 1, 2013 is also inconsistent with an opinion of total disability. (AR 1217–18).

Plaintiff also argues that subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints were not supported fully by objective observable signs. (Docket no. 13 at 8–9). The ALJ thoroughly addressed the plaintiff's complaints of pain and made a well-reasoned credibility determination that plaintiff's statements concerning the intensity, persistence, and limiting effects of these systems are not entirely credible. (AR 61–64, 66). While recognizing that subjective complaints are properly considered by treating sources when assessing physical limitations, those complaints must be supported by objective medical evidence. *See Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).

The court also finds that the ALJs decision to give Dr. Sigmon's assessments no significant weight is appropriate despite the ALJ's failure to expressly articulate and/or address every single factor under 20 C.F.R. § 404.1527(c)(1)–(6). *See Ambrose v. Astrue*, No. 2:11cv683, 2013 WL 1308981, at *9 (E.D. Va. Mar. 28, 2013) (characterizing the ALJ's failure to address the factors listed in 20 C.F.R. § 404.1527(c)(1)–(6) as harmless error when the treating physician's opinion is not consistent with the record during the relevant period). In addition, the ALJ also prescribed certain exertional, postural, and manipulative limitations that accounted for the substantiated claims of physical impairment.

**D. The ALJ's Determination that Plaintiff's Residual Functional Capacity Permits Him to Perform Jobs that Exist in Significant Numbers in the National Economy Is Supported by Substantial Evidence**

Plaintiff contends that because the ALJ did not give Dr. Sigmon's opinions the appropriate weight, the ALJ's subsequent determination that there are jobs that exist in significant number in the national economy that plaintiff could perform is not supported by substantial evidence. (Docket no. 13 at 10). The court finds plaintiff's first argument to be without merit because, as discussed *supra*, it finds the ALJ properly weighed Dr. Sigmon's opinions. Second, even assuming plaintiff is capable of performing other work, plaintiff maintains that the available medical evidence and testimony establish limitations that prevent his performance of the basic tasks of the occupations identified by the vocational expert. (Docket no. 13 at 11).

Upon determination of a claimant's residual functional capacity, the ALJ must next determine whether the claimant is capable of returning to past relevant work—step four in the adjudication of disability claims. *See* 20 C.F.R. § 404.1520(a)(2)(iv). If the ALJ finds in the affirmative in step four, the ALJ will conclude that the claimant is not disabled. *Id.* However, if the ALJ finds that the claimant is not capable of returning to past relevant work, review will then proceed to step five. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In step five of the adjudication, the ALJ must determine whether the individual is capable of adjustment to other work. 20 C.F.R § 404.1520(a)(2)(v). If a claimant's residual functional capacity limits his or her ability to perform the full range of work at a particular level, the ALJ must determine in this step whether there is work available in the national economy which the particular claimant can perform given their individual limitations. *See Walker v. Bower*, 889 F.2d 47, 49–50 (4th Cir. 1989). This determination can be aided by a vocational expert who has been made aware of all

the evidence in the record and to whom hypothetical questions are posed that "fairly set out all of

[a] claimant's impairments." *Id.* at 50.

Here, after consideration of the relevant medical and other evidence, the ALJ determined

that the plaintiff had the residual functional capacity to

> perform light work as defined in 20 CFR 404.1567(b)[9] and 416.967(b) except the
> [plaintiff] cannot climb ladders/ropes/scaffolds and can only occasionally climb
> stairs, balance, stoop, kneel, crouch, or crawl. Further, [the plaintiff] should avoid
> concentrated exposure to temperature extremes, vibration and hazards such as
> unprotected heights and moving machinery parts.

(AR 61). The ALJ afforded considerable weight to Dr. Franyutti's physical residual functional

capacity assessment in coming to this determination. (AR 64). Based upon this residual

functional capacity, the ALJ concluded in step four that the plaintiff was unable to perform any

past relevant work because the plaintiff's past relevant work was classified as a medium to heavy

level of exertion, thus exceeding his residual functional capacity of light work. (AR 64).

Proceeding to step five, the ALJ next considered whether, when considering the

plaintiff's age, education, work experience, and residual functional capacity, jobs that the

plaintiff can perform exist in significant numbers in the national economy. To aid in this

analysis, the ALJ took testimony from a vocational expert, Robert Jackson, who testified that he

had been made aware of all the necessary evidence in the record to formulate his opinion. (AR

100–01). The ALJ asked the vocational expert whether an individual of the same age,

educational background and work history as the plaintiff and a residual functional capacity

---

[9] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing
up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg
controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do
substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of
time." 20 C.F.R. § 404.1567(b).

consistent with Dr. Franyutti's evaluation[10] would be able to perform other work. (AR 102). The vocational expert indicated that such an individual would be able to perform the work of representative unskilled, light positions such as: packer, U.S. Dep't of Labor, *Dictionary of Occupational Titles*, § 920.685-026 (4th ed. 1991); cleaner, housekeeping, *Id.*, § 323.687-014; and inspector/grader, *Id.*, § 529.687-114. (AR 102–03). The vocational expert also testified to the number of positions for each unskilled, light vocation identified: over 7,700 packer positions in Virginia and over 320,000 in the United States; over 11,000 cleaner, housekeeping positions in Virginia and over 377,000 in the United States; and over 3,000 inspector/grader positions in Virginia and over 129,000 in the United States. (AR 102–03). After considering the other evidence in the record and the vocational expert's testimony, the ALJ concluded that the plaintiff could transition to other work, and thus, found the plaintiff not disabled. (AR 66).

Plaintiff asserts this conclusion by the ALJ is not supported by substantial evidence. Instead, the plaintiff argues that the medical evidence and testimony indicate that he would be unable to perform the representative unskilled, light positions of cleaner, packer, and inspector/grader. (Docket no. 13 at 10–11). Specifically, plaintiff argues that he would be unable to perform the task of "moving furniture, hanging drapes and rolling of carpet," which is required of a cleaner, and unable to "sit or stand at [a] workstation for the course of the work day," which is required of a packer and inspector. (*Id.*). The Commissioner contends that plaintiff's ability to perform light exertional work that includes (1) the lifting of no more than

---

[10] The plaintiff's residual functional capacity as determined by the ALJ mirrors Dr. Franyutti's evaluation. Specifically, Dr. Franyutti's evaluation concluded that the plaintiff's residual functional capacity allowed for light work. (AR 689). It further identified the exertional limitations of (1) occasionally lifting or carrying 20 pounds or less at a time with frequent lifting and carrying of objects weighing 10 pounds or less; (2) standing and/or walking for a total of about 6 hours in an 8-hour workday; and (3) sitting with normal breaks for a total of about 6 hours in an 8-hour workday. (AR 683) Dr. Franyutti also identified the following postural limitation: (1) occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; and (2) never climbing ladders, ropes, or scaffolds. (AR 684). Finally, the evaluation identified the following environmental limitation: (1) avoiding concentrated exposure to extreme cold, extreme heat, vibration, and hazards (e.g., machinery parts or heights). (AR 686).

twenty pounds at a time with frequent lifting and carrying of objects weighing up to ten pounds and (2) the ability to sit, stand, and walk for about six hours in an eight-hour work day allow the plaintiff to perform the tasks of cleaner, packer, and inspector/grader. (Docket no. 15 at 16–17).

The U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") indicates that the work of a "cleaner, housekeeping" would require plaintiff to perform "light work" such that plaintiff would be required to "[e]xert[] up to 20 pounds of force occasionally . . . and/or up to 10 pounds of force frequently . . . and/or a negligible amount of force constantly . . . to move objects." *See* DOT § 323.687-014, 1991 WL 672783 (Cleaner, Housekeeping). This requirement does not exceed the plaintiff's residual functional capacity to perform light work. Further, a cleaner, housekeeper occasionally must stoop, kneel, and crouch, but would not be required to climb, balance, crawl, or be exposed to extreme temperatures, vibrations, unprotected heights, or moving machinery parts. *See id.* These requirements also do not exceed the specific limitations of plaintiff's residual functional capacity as determined by the ALJ. Thus, while a cleaner, housekeeper may "move[] furniture, hang[] drapes, and roll[] carpets," the exertional requirements of these tasks do not exceed that of "light work" or the specific limitations of the plaintiff's residual functional capacity as found by the ALJ.

Next, plaintiff argues that he cannot perform the duties of a packer and inspector because the plaintiff would be required to "either sit or stand at the workstation for the course of the work day," which plaintiff claims the evidence and testimony make clear he cannot do. (Docket no. 13 at 10–11).

The DOT categorizes both packer and inspector as occupations requiring light work, and as relevant here, the requirement of "walking or standing to a significant degree" or "sitting most of the time." *See* DOT § 920.685-026, 1991 WL 687929 (Packer); DOT § 529.687-114, 1991

36

WL 674763 (Inspector).  Neither position requires a worker to climb ladders, ropes, and scaffolds.  *See* DOT §§ 920.685-026, 529.687-114.  Neither position requires a worker to more than occasionally balance, stoop, kneel, crouch, or crawl.  *See* DOT §§ 920.685-026, 529.687-114.  Finally, neither position requires a worker to be exposed to extreme temperatures, vibration, unprotected heights, or moving machinery parts.  *See* DOT §§ 920.685-026, 529.687-114.  Accordingly, the exertional requirements of the tasks required of a packer and inspector do not exceed that of "light work" or the specific limitations of the plaintiff's residual functional capacity as found by the ALJ.

Consequently, because the plaintiff can perform the jobs identified by the vocational expert in conformity with his residual functional capacity and individual limitations, which were properly determined by the ALJ in accordance with applicable law, substantial evidence exists that the plaintiff can make an adjustment to other work.

## V. CONCLUSION

Based on the foregoing, the Commissioner's final decision rendered on July 15, 2013—denying benefits for the period August 31, 2008 through July 15, 2013—is supported by substantial evidence.  The court also finds that proper legal standards were applied when evaluating the evidence and determining the credibility of various medical sources.  Accordingly, plaintiff's motion for summary judgment (Docket no. 12) is denied; the Commissioner's motion for summary judgment (Docket no. 14) is granted; and the final decision of the Commissioner is affirmed.

Entered this 13th day of October, 2015.

/s/
John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

37